The district court failed to make the reliability finding that rule 702 requires before allowing detective Jackson to testify as an expert. And this court can't find his testimony and the Sellbright report otherwise reliable because Jackson wasn't certified by Sellbright or anyone else to conduct this forensic examination and he didn't have enough training to know that Sellbright shouldn't be used on a computer. What's the difference between Sellbright and using a computer or a calculator? I don't have to know how a calculator works to put in numbers and make them multiply and come out with a product. Isn't that what all you did? You said I used this device and out came this information. Well, no, Your Honor, and I think if you look at Sarah Kranz's testimony, who was the other computer forensic examiner here, it becomes clear why it's much more than just typing something into a calculator. So Sarah Kranz testified at excerpts of record 823 and she is the examiner who extracted data from Max's devices and from McLeod's devices. And she testified that based on her training and experience, because she did have training and experience to do this, unlike detective Jackson, she knew there was a risk that if she used Sellbright on Jonathan's BlackBerry, because of sort of an idiosyncrasy in the way BlackBerrys work, the BlackBerry could, when she turned it on, automatically start deleting older data. And so she didn't want to take that risk and compromise the data on his BlackBerry, and so she didn't turn the BlackBerry on. She didn't run Sellbright on it. Ms. Hughes, it seems like courts, this court and others, have held that testimony just like detective Jackson here. That type of testimony was not expert testimony. I'm trying to figure out why we should hold differently here today, especially when you see United States v. Sara Gasala, where the officers who followed the software prompts from Sellbright and XRY to obtain data from electronic services not present testimony that was based on technical or specialized knowledge. There's also United States v. March and SEC v. Sabduran. Why would we go a different way when it seems very similar to what happened here? Well, I have two responses, Your Honor. First, the Fourth Circuit in Johnson and the Sixth Circuit in Gainier, in published cases, have held that this does require expert testimony, and that's because this does involve more than just plugging the Sellbright device into a mobile device. Sara Gasala, and I'm not sure if I'm pronouncing that right, but I think you know which one. That's Ninth Circuit. That's our precedent. It is, and it's unpublished, and there's not much reasoning to it. It does, like Your Honor said, it's that they followed the prompts and plugged Sellbright in. But what the Fourth Circuit and the Sixth Circuit recognize here is what the record reflects in our case, which is it does require more. Sellbright itself thinks that it requires six days of training to operate this device. The scientific forensic community believes this requires yearly testing, 40 hours of training, and the government, I'll note, noticed Sara Kranz in its motion in Lemonet as an expert and cited the Fourth Circuit and the Sixth Circuit cases saying this is expert testimony and tendered Jackson as an expert and didn't say this is lay testimony when we objected that he wasn't qualified. So I think it's disingenuous for them to claim now and to rely on these unpublished cases that this doesn't require expert testimony. Is there any evidence of what Kranz testified to that there was a deletion because the Sellbright was put on the BlackBerry? Well, the problem is, Your Honor, we don't know because the answer is no. Well, I mean, there's no evidence that it was deleted, but I don't know how we would prove that. It's sort of like proving a negative. She did testify again at 823 that when she told the case agent and the prosecutor about this risk, they both said don't run Sellbright on that BlackBerry. They didn't want to run that risk either because there's no way to really determine what's been lost. So what's been lost can't be used against your client, so it doesn't hurt. Well, what's been lost may have been a text from Jonathan saying, hey, I'm 28, I'm in college. That would have changed the whole sort of tenor of this case. Is there any evidence that he so testified? Did he ever said that? He didn't testify to that, but, again, we don't know what was on the phone. The point is that the whole sort of data set is contaminated, and we can't rely on it because Jackson didn't follow the proper procedures, and that's what Rule 702 is about is whether this testimony and the evidence is reliable. And here on this record where he didn't double check to make sure Sellbright didn't commit one of its known errors, he didn't check to see if the Sellbright device had been updated to fix those bugs that Sellbright knows exists. He didn't know that you shouldn't be using Sellbright on a BlackBerry because it could compromise the data. On that record, there's no way for this court to find that his testimony and the Sellbright report were otherwise reliable. Did that all come out before the jury? The Sarah Cran's point, that her testimony about the BlackBerry? But you were just saying, uh-huh. It did, Your Honor. So doesn't that go to weight and not admissibility? Well, I don't think so, Your Honor. Rule 702 and Daubert envision that the district court is going to be some type of gatekeeper. The weight and the credibility are more to is the sample tainted, or does the examiner have a bias? It's not whether this expert reliably used the technology and whether the technology itself is reliable. Those are the issues that the district court is supposed to be a gatekeeper for. And allowing in this evidence and the error was really problematic here because the government used the Sellbright report as its strongest evidence for each of the disputed issues at trial. So there's no way to rebut the presumption of prejudice here. So for the production counts, the issues were did McCloud know that he was dealing with teenagers and did he solicit these images? For the production count, knowledge of the minority of the image is not necessary. Well, it's not, but McCloud had raised this reasonable mistake of age affirmative defense, and so that wasn't in line. And he presented evidence on that issue? Correct. I mean, that was really what the fight was about for these counts because his defense was that he didn't know until late on the night of May 26th that Jonathan was a minor. When he picked him up in San Diego? Well, no, earlier. Earlier. That's sort of the end of their texting relationship was when he found out. And so the government, and I think the government used these text messages to hammer home that McCloud knew, and that's partly because Jonathan's testimony on whether he told McCloud that he was underage was seriously impeached. He had testified before the grand jury that McCloud didn't know his age. He had told his aunts at the time that McCloud didn't know his age, and he had told law enforcement during the initial interviews that McCloud didn't know his age. And then he came to trial and claimed that McCloud did know his age. And so the government couldn't rely on his testimony and instead pointed to these text messages. So how would you distinguish Cantor from the argument that you're making now? Because, as Judge Bea points out, Judge Kaczynski in 1988 said there is an affirmative defense, but the burden of proof, not the burden of production, the burden of proof on the defendant is by clear and convincing evidence. And now you're arguing, well, that was just a First Amendment determination. This is a due process argument, right? Well, I'm still in the 702 Harmlessness Analysis. But, yes, I mean, we can discuss the mens rea, the 2251 mens rea issue. Is that what Your Honor is asking me? Well, because— I'm happy to discuss it. It sounds like you just went into we can't show that he, your client, knew the age, which goes to the intent. Well, I'm talking about the harmlessness because there were two issues for the production counts. One was the solicitation for which the government relied on the timestamps in the Selbright report to sort of show the sequence of the conversations and show that McLeod was soliciting the images. The second issue was whether McLeod, this affirmative defense, whether McLeod knew that he was dealing with teenagers. And for that point, to disprove McLeod's defense, the government hammered home with these text messages. They said, you see messages in which it is obvious the defendant knows that Jonathan is not an adult. It referenced specific messages. This is in its closing at ER 1029 and 1031. And it said, do you have a shred of doubt that the defendant receiving that message knows he's talking to a minor? No. So it relied on these text messages as its best evidence for the production counts. Same thing for the travel and transportation counts. It relied almost exclusively on the text messages to show that he traveled with a sexual intent. Supplemental Excerpt 475, it said, the evidence of the touching on the airplane and in the car merely corroborates the defendant's intent. You already know what it was from all the text messages and all of the photographs. And again, that's because Jonathan's testimony about the touching was impeached by the forensic data, by the five airplane witnesses that came, and the fact that he didn't report this initially when they landed in Tampa. I'd like to, if I can, reserve the last minute for rebuttal. Okay. Thank you. May it please the court. Daniel Zip on behalf of the United States. Your honors, the district court was well within its discretion in allowing Detective Jackson to testify about his download of the victim, Jonathan's cell phone using a cell bright system. What Detective Jackson offered was straightforward, factual testimony about what he did. Did Jackson testify after Kranz or before? It was before. Why did you qualify Kranz and not qualify Jackson? Kranz testified, if I recall correctly, to sort of more involved forensics analysis, whereas Detective Jackson, all he testified to was that I plugged it into a machine and this report came out. There was no discussion of sort of deleted, unallocated space, or anything that would require an expert testimony. It was based purely on his. So Kranz was available for cross-examination as to things that could go wrong with a cell bright? Yes. She testified extensively about what cell bright is, how it works, how it creates a mirror image. They could have. Was she cross-examined as to whether anything was inadvertently blacked out by the use of a cell bright? No, Your Honor. At no point until the appeal did the defendant raise any of these issues about the reliability of cell bright. So do law enforcement officers who, I guess, testify about technology such as cell bright ever have to be qualified as expert witnesses, or is it your position that they never have to be qualified? No. I mean, there could be situations if they required specific scientific or technical knowledge. And in this case, why wasn't Jackson needing to be qualified? Because the nature of his testimony was straightforward. It was, here's a machine that we use regularly in our practice that write blocks to prevent anything from being adjusted on the phone, that you simply plug the phone in, put in a hard drive, and then it gives you a series of prompts as to what type of information you want off the phone, and that's it. And then you put the evidence in. There was nothing scientific or technical about it. It's in line with any number of other sort of technical devices that law enforcement might use in their normal practice. You know, anything from a GPS to running a rap sheet are things that officers use that may have a technical aspect to them, but their testimony about how they're used is straightforward. Was there a forensic analysis? I mean, my experience is when you have those people that do those things, they first tell you how they extracted it, then they tell you how the system works to extract it, and then they go on and tell you what it says, which is expert testimony. Is that what Jackson did? No, Your Honor. That might be the case in some more involved sort of forensic computer analysis, but this is a machine that detectives and officers use regularly as part of their practice. There's an analogy in your briefing that it's like a photocopy machine, but it isn't. When I photocopy something, I know what I have on the piece of paper. I put it on the photocopy, and the identical thing comes out. That's not the case here, is it? It is, Your Honor. So how did he know what was there to start with? Jackson. He doesn't. The text messages were on the phone. I mean, he could have conceivably simply turned on the phone and scrolled through and taken pictures of each of the text messages. That would have raised some issues of potentially manipulating the evidence on the phone, which is one of the reasons that he uses Cellbrite is to make sure that nothing gets changed from the phone. All it does is spit out essentially a photocopy of what's on the phone. So the question on reliability of Cellbrite, I mean, was that addressed by Jackson or by who? Or was that ever fully discussed? They never impeached him directly with the sort of problems that they're raising now in appeal about Cellbrite or the potential inconsistencies. To respond to my opponent's point about the deletion that Sarah Krantz discussed, she was given the phone many months after the crime was committed, and her testimony made clear that her concern about the deletions was this sort of automatic delete function based on the date of the messages on the phone, so that she was worried if she turned it on eight months or however long it was after the crime was committed, that it would automatically delete everything beyond a certain date. Detective Jackson testified that he plugged this into Cellbrite while the crime was going on. It was while Mr. McCloud was in Florida the day he was arrested. So any concern about exculpatory emails saying that he knew he was 28 at the time, that would not have been called into question here based on the timing of Agent Jackson. If he was an expert, was there error in not making a Daubert finding? No, because this Court's case law is clear that the mere fact that someone is an expert does not mean that they have to be. The focus is on the nature of the testimony itself, not whether he is or isn't an expert, and what he offered here was not based on scientific or technical knowledge. Would you address this issue of why were the touching counts not severed? That seems like it was problematic. Well, I think for two reasons. First, Your Honor, as the District Court held in this case, the touching evidence was probative to the production counts. Once the defendant put on a reasonable mistake of age defense, then the fact that if his defense was on May 26th, I discovered that this guy really wasn't 18 like he said, and from that point on I wanted nothing more to do with him, that defense is directly undercut if the following week he flies to California and picks him up in a middle school and molests him. That's what I think the problem is, and I think it was argued in front of the District Court, that defense counsel had submitted an instruction on the affirmative defense that Cantor says is available. But in the argument with the court, the court said, well, you're having that defense. Counsel basically said, well, I don't know. I had to put the instruction in, and then the court said I'm going to allow it in to rebut. Why is rebuttal part of the case in chief? Because you forced her hand. You forced her to make that defense by putting on a rebuttal of what is a potential defense as opposed to one that was actually there, and then you had to rebut it. My question is simple. I've never heard of the prosecution rebutting a defense before the defense is put on. That's not a part of your case in chief, is it? Well, Your Honor, I think the defense all along was this mistake of age. It's really the only thing that they could argue. As Your Honor pointed out earlier, under Cantor II, there's no age requirement for us to even prove. So their defense throughout, I mean, first of all, they never put on any real direct testimony that there was a mistake of age. It was based on the prosecution's text messages that they sort of suggested that there was a mistake of age. But I guess the... I don't understand. Perhaps I'm not understanding how that fits into the severance argument. Well, it does because if the judge severances, any of that touching evidence is not relevant to the production evidence, right? And your argument was, yes, it is. It proves that he knew they were minors and all that sort of thing. Yes. Well, on that point then, even if that were the case, this court's case law is clear that even if it wasn't directly relevant to all of the counts that were charged, the standard has to be clear, manifest, and undo prejudice. And in this case, even if it wasn't probative of the production counts, it was certainly all part of the same scheme within the same week. You don't think that a jury sitting there listening to the testimony that was presented regarding the touching by the individuals and then the other testimony, you don't think a jury sitting there listening to that would not be influenced in determining the production accounts? Your Honor, I think you have to look at this in the total context. The testimony that came in about the production accounts was extremely inflammatory, extremely graphic. I mean, if you look at the text messages, it's this sort of defendant manipulating a 14-year-old to send videos of himself masturbating, and the jury watched all of that. I mean, yes, to answer your question, it is more inflammatory to have direct testimony that, yes, he molested me in the car, but not by much. This is not like this was a bank fraud case where we're sneaking in this testimony. I mean, this was entire case was inflammatory. Okay, so I want to ask another question. I'm consuming everything here, but if there was a self-defense, the burden of proof is not by clear and convincing evidence. It's a burden of production. But whatever the burden of proof is on the defendant for an affirmative defense, is it then your obligation to prove beyond a reasonable doubt that the defendant knew that these were minors? You have to disprove the affirmative defense rather than him having to prove he's not guilty. No, Your Honor. That's not my understanding of what Cantor II said. I'm not talking about Cantor. I'm talking about general principles of law and due process. The defendant cannot be made to prove anything in a criminal case. They can be required to produce evidence, but if they produce evidence, isn't it your obligation to then prove beyond a reasonable doubt that he actually knew that these were minors? Your Honor, my understanding is we have to prove beyond a reasonable doubt the elements of the offense which do not include knowledge of the minor's age. In Cantor II, this court carved out a narrow exception and said there is an affirmative defense, but the burden is on the defendant to prove that. It is, but under general principles of law, the government then has to disprove the affirmative defense beyond a reasonable doubt. That's my only question, and I'm sorry, Judge. All right. We're taking the appropriate time. Thank you. Butler? Very quickly, Your Honors, just about the Selbright. Judge Molloy, I think your questions highlight why this requires specialized knowledge and why that's what the Sixth Circuit in Gainier, which is 468 F. 3rd. 920, held, that it requires knowledge and familiarity with computers and the forensic software well beyond the average layperson. Because Selbright, you have to know where the deleted data is on the phone to know how to extract it from the phone. Jackson didn't know any of that, and Jonathan did testify that he and McLeod had a regular practice of deleting their text messages at the end of the day. So we do know that there was deleted information on this phone, and it requires specialized knowledge to figure out where that is on the phone and how to get it. And Jackson just didn't have any sort of training to do this. Can I ask you a question? Sure. Could the jury have inferred from the context of the test messages, putting aside the time stamps, that Jonathan was underage? It seems like in the messages they talked about school and not being happy at home. Could the jury not have inferred that Jonathan was underage even without these time stamps that you're arguing? Well, the defense relied on the timing of these text messages because his defense was tied to this May 26 date. So the timing of the text messages was relevant in the context of this case. There's also the issue of, again, we don't know what came before or after those text messages, so we don't know if they were joking, if they were discussing, you know, something that had happened previously, if this was about the game. Did you acknowledge that there was references to school and to Jonathan being in school? There were, Your Honor, but there's no way to tell if Jonathan was being truthful given that they were playing this sort of online fantasy game. I mean, that was the defense that came up is that this is across the country. No one knows who's telling the truth. People frequently misrepresent their identities online, and so there was really no way to tell if he was being truthful. Thank you very much, Ms. Hughes. Thank you, Your Honor. Thank you, counsel, for a very good argument.
judges: Bea, Murguia, Molloy